UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Peter B. Ritz**, | ) COMPLAINT )  ) |
| Plaintiff, | ) Case No.:_____ ) |
| v. | ) ) |
| **Genius Group Limited**, **Roger Hamilton**, and **Eva Mantziou**, | ) JURY TRIAL DEMANDED ) ) ) |
| Defendants | ) ) |

Plaintiff Peter Ritz ("Plaintiff"), by his attorneys, Foley & Lardner, alleges for his complaint as follows:

## I.   PRELIMINARY STATEMENT

1. Plaintiff was hired to serve as the Chief Revenue Officer ("CRO") for Defendant Genius Group Limited ("Genius") after Genius signed an Asset Purchase Agreement ("APA") to acquire the core assets and specified liabilities of LZG International Inc ("LZG"). Prior to the APA, Ritz was a director and Chief Executive Officer ("CEO") at LZG.

2. At all relevant times, LZG was a publicly traded company incorporated in Florida and headquartered in New York, offering easy-to-use artificial intelligence ("AI") and information technology ("IT") solutions for businesses.

3. At all relevant times, Genius was a publicly traded company organized under the laws of Singapore with its stock listed on the New York Stock Exchange, offering AI-powered education products in the educational technology ("edtech") space.

4. On or about January 24, 2024, when the APA was signed, Genius had virtually no

revenue. LZG, on the other hand, generated audited revenue of $43+ million in 2024. Plaintiff was intimately familiar with LZG's business and the disclosure obligations of public companies at the time he became Genius's CRO.

5. In or about August 2024, Plaintiff attended a meeting with Genius's CEO, Roger Hamilton ("Hamilton"), where Hamilton stated that he intended to provide market analysts with grossly exaggerated revenue guidance that Plaintiff knew could not be achieved based on his personal knowledge of Company's operations. Plaintiff told Hamilton that the guidance he intended to issue would be false, misleading, and a violation of U.S. securities laws. When Hamilton insisted, Plaintiff reported Hamilton's behavior, including what Plaintiff reasonably believed to be violations of the law, to Genius' Board of Directors (the "Board"), including the Board's Compensation Committee ("Compensation Committee") and Chairman of the Board, Compensation Committee Chairman, and former LZG executive Mr. Michael Moe ("Moe"). who voted to remove Hamilton from his position (the "Whistleblower Report").

6. When Hamilton learned of the Whistleblower Report and subsequent Board action, he threatened to sue and press criminal charges against all independent Board members who had removed him, causing four individuals to immediately resign. Hamilton also pushed out Moe from his positions on the Board. Thereafter, Hamilton filled the vacant Board seats with cronies who allowed Hamilton to continue to use grossly overstated revenue guidance and fraudulently pump Genius's stock in spite of U.S. securities laws.

7. In retaliation for Plaintiff's Whistleblower Report, Hamilton and Eva Mantziou ("Mantziou"), Genius's Head of Human Resources ("HR") and Hamilton's spouse (together with Genius, "Defendants"), concocted a scheme to fire Plaintiff and blacken his reputation in order to bury Hamilton's acts of fraud. Hamilton and Mantziou prepared and distributed a termination

letter that accused Plaintiff of completely manufactured acts of misconduct and, without notice or consultation of any kind, retaliatorily fired Plaintiff less than 48 hours after the Board vote to remove Hamilton following the Whistleblower Report.

8. After unlawfully discharging Plaintiff for making the protected Whistleblower Report to the Board, Defendants defamed Plaintiff to investors, employees, and industry contacts.

9. Defendants also misappropriated Plaintiff's deferred salary through Genius' fraudulently administered "Long Term Investment Plan," ("LTIP"), and an integrated short-term equity-backed compensation plan (the "Plan"), by falsely promising investment returns at double value plus equity incentives, in violation of the Employee Retirement Income Security Act ("ERISA") and U.S. securities and/or commodities laws.

## II. JURISDICTION AND VENUE

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims in Count II and Count III arise under ERISA, 29 U.S.C. § 1001 et seq., including the enforcement provisions under ERISA § 502, 29 U.S.C. § 1132.

11. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) as this is a civil action between Plaintiff, a citizen of Pennsylvania, Defendants are citizens of Singapore, the United Kingdom, and/or Poland, and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims under Article III of the United States Constitution, arising from a common nucleus of operative fact.

13. Venue is proper under 28 U.S.C. § 1391 because Defendants transact business in

this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

14. Personal jurisdiction exists over Defendants because they have sufficient minimum contacts with New York, including transacting business and committing tortious acts in the State, purposefully directing activities toward U.S. markets, utilizing U.S. securities exchanges, and engaging in New York employment activities.

### III. PARTIES

15. Plaintiff **Peter B. Ritz** is a tax resident of the Commonwealth of Pennsylvania, while he also maintains a residence in state of New York and performed work from LZG's principal office located at 135 W. 41st Street, Suite 5-104, New York, New York at all times relevant to this Complaint.

16. Defendant **Genius Group Limited** is a Singapore corporation, with executive offices in Singapore and a registered agent in New York. Genius is publicly traded in the U.S. on the New York Stock Exchange American under stock symbol "GNS."

17. Defendant **Roger Hamilton**, CEO of Genius Group, is, upon information and belief, a citizen of Singapore and the United Kingdom. Hamilton directed the fraudulent guidance, retaliatory acts, and withholding of Plaintiff's wages and benefits in violation of ERISA.

18. Defendant **Eva Mantziou**, Genius Group Head of HR, is Hamilton's spouse and is, upon information and belief, a citizen of Poland. Mantziou acted in concert with Hamilton to retaliate against Plaintiff and withhold Plaintiff's wages and benefits in violation of ERISA.

### IV. FACTUAL ALLEGATIONS

19. After Genius and LZG signed the APA on or about January 24, 2024 for Genius to acquire the core assets and specified liabilities of LZG, Plaintiff was hired to serve as CRO for

Genius.

20. On or about May 31, 2024, Plaintiff and Hamilton, in his capacity as CEO of Genius, executed an employment agreement (the "Employment Agreement") to memorialize Plaintiff's role as CRO. Plaintiff was employed as CRO effective June 3, 2024 to September 24, 2024.

21. Under the terms of the Employment Agreement, Plaintiff was entitled to $370,000 in annual base compensation plus 50% bonus of the base compensation, aggregating $555,000 annual on target performance ("OTP"). The Employment Agreement also awarded to Plaintiff 400,000 shares, split adjusted, vested over three years under the LTIP.

22. Prior to the asset purchase by Genius, Plaintiff was a director and CEO at LZG. Plaintiff is a respected and experienced technology executive with a business, AI, and enterprise cloud focus. Prior to LZG, Plaintiff served as Managing Director, co-founder and funder at FatBrain LLC, an AI solutions company, and was Executive Chairman of Observable Networks, a cybersecurity company acquired by Cisco, leading the company's Series A funding round. He also served as an active contributor to the advisory board of Vmware MSP while working as co-founder and president at Xtium, a cloud company. Earlier, he was a partner at Cross Atlantic Capital Partners and co-founder and Chief Technology Officer ("CTO") at AirClic, a mobile QR code technology pioneer acquired by Motorola. Plaintiff has degrees in Biochemistry/Molecular Biology and Computer Science, is a licensed patent attorney, and has lectured at the University of Pennsylvania Law School.

23. In the period leading up to the execution of the APA, Genius repeatedly and falsely represented to LZG that it was a successful edtech business. Its October 2023 investor pitch deck to LZG (the "Pitch Deck") claimed that Genius had 5.4 million students, and that 179,000 of those

students paid $200 per year for Genius's services. Genius also represented that it had a robust revenue acquisition engine whereby $0.73-$0.75 invested into acquiring a student turns into $15.46-$42.58 of revenue in less than two years.

24. In reality, Genius had virtually no revenue, a fact not disclosed by Genius and unknown to LZG and Plaintiff at the time the APA was executed, since Genius did not file quarterly financial reports with the Securities and Exchange Commission ("SEC") as a foreign entity.

25. By contrast, LZG, through its core asset, Prime Source Group ("PSG"), was a real and profitable business, incorporated in Florida with its principal offices located in New York City. In 2023, LZG's PSG subsidiary generated more than $50 million in audited revenue and $5 million in profit. Similarly, in 2024, LZG's PSG subsidiary generated more than $43 million in audited revenue and $4 million in profit. Plaintiff was intimately familiar with LZG's business and the SEC disclosure obligations of public companies at the time he became Genius's CRO.

26. On January 24, 2024, the day the APA was signed, Genius issued a press release stating that, "joining forces [with LZG] accelerates our business with substantial growth in anticipated pro forma revenues and profitability." According to Genius, the combined estimated gross revenue of LZG and Genius after the asset purchase would be $80 million in 2023. In fact, $50 million of that revenue came from PSG alone.

27. In the APA, in exchange for LZG's core assets, Genius agreed: (1) to issue 73,873,784 ordinary shares of its stock to LZG; (2) to assume $15 million in liabilities, including (a) payment obligations of $10.3 million due by LZG to the prior sellers of the Prime Source Group companies ("PSGC"), a debt that was secured pursuant to a security agreement that was disclosed to Genius at the time; (b) $4.7 million in other LZG liabilities as part of its planned tax efficient

wind-down; and (3) to appoint two members designated by LZG to the Board. Genius agreed to assume responsibility for the payments LZG owed to the sellers of the PSGC by paying the sellers of the PSGC directly. Although Genius's acquisition of the PSGC was immediate, the sellers of the PSGC agreed to continue accepting the remaining purchase price in installment payments, with the $15 million under the APA earmarked to retire the debt due on March 31, 2024.

28. After the APA was signed, Plaintiff began working to assist with the integration of LZG into Genius's business. This included introducing Hamilton to LZG investors and strategic partners, e.g., Brent Richardson, CEO emeritus of Grand Canyon University and Dr. Ali Saeed Bin Harmal Aldhaheri, founder and chairman of Abu Dhabi University, the largest private university in the United Arab Emirates, and First Vice Chairman of the Abu Dhabi Chamber of Commerce Board of Directors.

29. On June 6, 2024, three days after Plaintiff's effective hiring date, Hamilton guided investors in an SEC Form 6-K report by stating that, "[a]s we execute our growth plan, we are increasing our communication and outreach to institutional investors, family offices and investment funds. With 2024 guidance of over $100 million in revenue and year-on-year growth of 50%, we believe we are now reaching a size that is attractive to more investors."

30. Plaintiff's job duties as CRO included, among other things, "prepar[ing] regular reports for other senior managers and board members and investors, providing updates on revenue performance, forecasts, and strategic initiatives."

31. One of Plaintiff's job duties during this time also included communication with investors about company performance. For example, Plaintiff led multiple corporate investor presentations during the Noble Investor Conference and Sidoti Micro-Cap Investor Conference, and conducted in-person meetings with prospective investors in New York City.

32. Plaintiff's place of work for Genius was "flexible" and "initially virtual." Genius was aware at the time the Employment Agreement was signed that LZG's principal physical office was located in New York City. At all times relevant to this Complaint, Plaintiff worked from the New York office as convenience and/or necessity required.

33. Plaintiff's compensation package included a salary of $370,000 per year, subject to re-negotiation upwards after three years, with a performance bonus of up to 50% of salary for achieving pre-agreed performance targets. Plaintiff was also entitled to 400,000 incentive stock options, vesting over three years; an additional 400,000 in incentive stock options each year on the anniversary of Plaintiff's commencement date; health insurance for Plaintiff and his family; life insurance; a 401K to be matched by the employer (up to a maximum of 6%); and unlimited vacation.

34. Consistent with his new responsibilities as CRO, between May and July 2024, Plaintiff met with sales, marketing and technology executives at Genius to understand the revenue generated by Genius's non-LZG businesses.

35. During this time, Plaintiff asked Genius executives about the non-LZG revenue that Genius had generated in the first half of the year. Contrary to Genius's representations that it maintained a robust underlying business with millions of students, Plaintiff learned that Genius had generated a meager $120,000 -$150,000 in revenue per month in the preceding months, rather than the millions in revenue that Hamilton had led LZG and the market to expect. Concerned, Plaintiff continued to investigate internally in order to assess whether there was any reasonable basis for Hamilton's previous and continuing market guidance.

36. On or about August 1, 2024, Genius entered into the Plan with its employees as part of its LTIP. Genius, Hamilton, and Mantziou, as Head of HR, represented to employees,

including Plaintiff, that the Plan allowed employees to forego up to 50% of their cash compensation in exchange for a 50% return on amounts invested, in addition to the return of their capital, by November 30, 2024. That is, under the Plan, a $100,000 salary contribution in August would be returned to the employee in full by the end of November plus $50,000 in earned interest, for a total of $150,000.

37.     Defendants' promises about the Plan and a guaranteed return of 50% by November 30, 2024 were made without the delivery of any disclosure documents, any description of how the funds would be used, or any risk disclosure with respect to the investment. These promises were made both verbally by Hamilton on or about August 1, 2024 to the management team comprising the CFO, CRO, HR, and also to the Board. Defendants also sent emails to employees which repeated these statements in or about early August 2024. These emails are now exclusively in the custody, possession and control of Defendants, as Plaintiff's access to his former Genius emails has been revoked.

38.     On or about August 29, 2024, Plaintiff allowed approximately 50% of his salary, retroactive to August 1, 2024, the maximum amount according to Defendants' representations, to be withheld and invested into the Plan.

39.     Upon information and belief, Hamilton, Mantziou and Genius misused the funds that employees designated for the Plan, instead deploying them imprudently and/or for self-interested and speculative purposes, potentially including purchases of the Company's own securities. Alternatively, upon information and belief, Defendants failed to invest the employees' funds at all, and instead spent them for self-interested and undisclosed purposes.

40.     Up through August 2024, Plaintiff continued to investigate whether there was any good faith basis for the revenue guidance that Hamilton continued to give to the market.

Ultimately, when his questions about the basis for Genius' future revenue projections could not be answered to his satisfaction, Plaintiff concluded, in good faith, that Genius's representations about its revenue during negotiations and thereafter were knowingly false and misleading in violation of law, rule, and/or regulation.

41. In or about early August 2024, Plaintiff attended a meeting with Hamilton to prepare reports of financial performance to present to the Board. In that meeting, Hamilton stated that he intended to provide market guidance in an amount that Plaintiff knew to be grossly exaggerated based on Plaintiff's personal knowledge of Genius and LZG's combined operations. Plaintiff told Hamilton that his intended guidance would be false, misleading, and a violation of the U.S. securities laws. When Hamilton persisted in his presentation of facts he knew to be false, misleading, and in violation of law, rule, and/or regulation, Plaintiff made the Whistleblower Report regarding Hamilton's behavior to Moe as Chairman of the Board, head of the Audit Committee, and the supervisor to whom both Plaintiff and Hamilton ultimately answered.

42. On or about August 14, 2024, at a meeting of the Board, Hamilton presented the financial performance, including the forecast and his plans regarding the guidance (the "Board Presentation"). Notwithstanding Plaintiff's earlier vehement objections, Hamilton's forecasts still included the knowingly false and misleading projections which Plaintiff had informed him were false, misleading, and in violation of law, rule, and/or regulation.

43. On or about September 22, 2024, after inquiry and investigation into the Whistleblower Report, the Board Presentation, and Hamilton's claims, the four members of the Board's Compensation Committee held a meeting and voted to remove Hamilton from his position as CEO of Genius.

44. Hamilton refused to recognize the Board's action removing him from office, and

continued to act as Genius CEO.

45. In retaliation for Plaintiff's Whistleblower Report to the Board, Hamilton and Mantziou – who was paid a staggering million dollars a year to serve as Genius's Head of HR – concocted a scheme to fire Plaintiff and blacken his reputation in order to bury Hamilton's ongoing acts of fraud.

46. Similar tactics have been used by Mantziou before, who was criminally prosecuted in Poland for making vicious, ungrounded and defamatory accusations against her ex-husband as part of their separation. As a result for these unfounded claims, Mantizou was ordered by a court to post an apology to her ex-husband on social media for 60 days, stating, among other things, "I apologize for accusing [him] of using violence against me and my child, persecuting him, surveilling him, committing fraud and misappropriating property, and filing false accusations with law enforcement."

47. On or about September 24, 2024, approximately 48 hours after the Board acted on the Whistleblower Report, Plaintiff received by email, without any prior notice or consultation, a termination letter jointly signed by Mantziou and Hamilton. The termination letter contained completely manufactured acts of misconduct, accusing Plaintiff of a "lack of integrity," "fraud" and other professional failures, which were not judged in good faith on the merits by Genius, but instead were the product of Hamilton and Mantizou's scheme to retaliate against Plaintiff for engaging in protected whistleblower activity. Genius announced its termination of Plaintiff in an SEC Form 6-K on the same day.

48. Upon information and belief, to further retaliate against Plaintiff after unlawfully discharging him for making the protected Whistleblower Report, Defendants repeated the baseless and defamatory statements regarding Plaintiff's cause for termination to internal and external

parties, including investors, employees, and industry contacts. with the intent of damaging his reputation.

49. Shortly thereafter, acting in coordination with Mantziou in her capacity as a "shareholder of Genius," Hamilton, through counsel, demanded the resignation, within **24 hours**, of all Board members who had voted to remove him. If they refused, Mantizou and Hamilton threatened that the named shareholders of Genius, including Mantziou, would "immediately commence legal proceedings against each of you personally in the Courts of the Republic of Singapore without further reference to you."

50. Separately, Hamilton wrote Moe, saying that the same lawyers now represented the entire Genius management team, and threatened that Genius's customers and over three hundred Genius shareholders would sue Moe, and that there could be arrest warrants and "criminal proceedings which could result in jail time" if Moe did not step aside from his Board positions. In the face of Hamilton's extreme and outrageous threats, the members of the Compensation Committee who had voted to remove Hamilton resigned. Genius's Chief Financial Officer also chose to quit rather than remain in the face of Hamilton's fraud.

51. Defendants also misappropriated Plaintiff's deferred salary through Genius' fraudulently administered ERISA plan, the LTIP, while falsely promising returns at double value plus equity incentives.

52. Plaintiff repeatedly demanded repayment, which was refused.

53. The false statements and accusations made by Genius about Plaintiff were malicious, unfounded, and intended to injure his reputation with the market, future investors, and future employers. Plaintiff has suffered severe injury in his personal and professional life as a result of Defendants' course of conduct, and his reputation has been injured in the investment

community.

54. Defendants' unlawful acts violated the New York whistleblower statute, N.Y. Lab. Law § 740, and federal law.

## V. CLAIMS FOR RELIEF

### COUNT I
### Wrongful Termination in Violation of the New York Whistleblower Statute, N.Y. Lab. Law § 740

55. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

56. Plaintiff was at all relevant times an employee of Defendant Genius, working in part from the principal office of Genius-acquired LZG, located at 135 West 41st Street, Suite5-104, New York, New York.

57. At all relevant times, Plaintiff was an "employee" under N.Y. Lab. Law § 740(1)(a).

58. At all relevant times, Genius was as an "employer" under N.Y. Lab. Law § 740(1)(b).

59. At all relevant times, Hamilton, Mantizou, Moe, the Board, and its Compensation Committee were "supervisor[s]" under N.Y. Lab. Law § 740(1)(f).

60. In the course of his employment, Plaintiff discovered and reported serious misconduct by Hamilton as CEO of Genius, including but not limited to violations of U.S. securities laws.

61. Plaintiff objected to and/or refused to participate in the serious misconduct by Hamilton as CEO of Genius, including but not limited to violations of U.S. securities laws.

62. Plaintiff disclosed his concerns in the Whistleblower Report to Moe, the Audit Committee and the Board in their capacity as Plaintiff's supervisors within the meaning of N.Y.

Lab. Law § 740(1)(f).

63. Defendants terminated Plaintiff for engaging in protected whistleblowing, which violates public policy.

64. Plaintiff reasonably believed that the activities, policies and practices he reported to his supervisors via the Whistleblower Report constituted violations of law rule, or regulation.

65. Shortly after Plaintiff made his Whistleblower Report to his supervisors, the Compensation Committee acted on his disclosure and removed Hamilton as CEO.

66. Almost immediately following the removal of Hamilton, as a result of the Whistleblower Report, Plaintiff was summarily terminated from his employment with Genius by Hamilton and Mantiziou, on behalf of Genius.

67. Defendants' baseless termination of Plaintiff in response to the Whistleblower Report constituted "retaliatory action" within the meaning of N.Y. Lab. Law § 740(1)(e).

68. The temporal proximity between Plaintiff's Whistleblower Report and Plaintiff's termination demonstrates that Plaintiff was discharged as direct result of his protected whistleblowing activity.

69. Defendants' retaliatory action was willful, malicious or wanton.

70. The conduct of Defendant was a direct and proximate cause in bringing about serious injuries, actual damages, and harm to Plaintiff as outlined more fully above and, including lost wages, lost benefits, harm to reputation, and distress, and, as a result, Defendant is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with civil penalties, injunctive relief, attorney's fees, and the cost of litigation, as well as such further relief as may be permitted by law.

//
//

## COUNT II
### BREACH OF FIDUCIARY DUTY AND PLAN ADMINISTRATION DUTIES
### ERISA, 29 U.S.C. § 1001, ET SEQ.

71. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

72. At all relevant times, Defendants established and maintained the LTIP and the Plan as employee pension benefit plans within the meaning of ERISA § 3(2)(A) and § 3(3), 29 U.S.C. § 1002(2)(A) and § 1002(3).

73. Specifically, the LTIP was funded through deferred portions of eligible employees' earned wages, including Plaintiff's salary, and was maintained for the purpose of providing participants with deferred income and investment return to be paid at a date later than their earned work, meeting the statutory definition of an ERISA-covered plan.

74. Plaintiff was a participant in the LTIP and the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), having elected to defer approximately 50% of his salary, retroactive to August 1, 2024, into the Plan, in reliance on Defendants' representations that the funds would be invested prudently and returned in full with a guaranteed 50% gain by November 30, 2024, along with additional equity incentives.

75. At all relevant times, Defendants were fiduciaries of the LTIP and the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) by virtue of exercising discretionary authority and control over the management of the LTIP and the Plan, the management and disposition of LTIP and Plan assets, including Plaintiff's deferred wages, and the administration of the LTIP and the Plan.

76. Specifically, Defendants' fiduciary status arose from their roles in creating the LTIP and the Plan, setting their terms, soliciting employee participation, deciding the use of LTIP and Plan assets, purportedly diverting Plaintiff's wages into the LTIP and the Plan, and controlling

payments from the LTIP and the Plan.

77. At all relevant times, Defendants were subject to the fiduciary standards of prudence and loyalty under ERISA § 404, 29 U.S.C. § 1104.

78. Defendants breached their fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) by failing to discharge their duties solely in the interest of LTIP and Plan participants and beneficiaries, for the exclusive purpose of providing benefits and defraying reasonable plan expenses, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use.

79. Specifically, Defendants violated ERISA by, among other things:

   a. Engaging in imprudent and speculative investments, and/or failing to invest Plaintiff's funds altogether, in violation of the prudent person standard under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1);

   b. Failing to act solely in the interest of plan participants and beneficiaries, breaching the exclusive benefit rule under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

   c. Engaging in self-dealing and prohibited transactions, violating ERISA § 406(b), 29 U.S.C. § 1106(b); and

   d. Failing to disclose material terms and risks associated with the purported investment of Plaintiff's withheld wages into the LTIP and the Plan, in violation of the duties of care and diligence under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

80. Defendants further violated ERISA by unlawfully withholding Plaintiff's salary, promising to invest the withheld wages and return them in full in a matter of months with a

guaranteed 50% return without providing appropriate plan documents, required disclosures, or risk factors as mandated under ERISA § 101(a), 102, 104(b), 29 U.S.C. § 1021(a), 1022, 1024(b).

81. As a direct and proximate result of Defendants' unlawful denial of benefits, Plaintiff has suffered financial losses equal to the unpaid return of his deferred wages contributed to the LTIP and the Plan, the unpaid plan benefits plus interest, loss of guaranteed investment return, loss of equity incentives, and related consequential damages.

## COUNT III
## CLAIM FOR PLAN BENEFITS
## ERISA § 502, 29 U.S.C. §1132

82. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

83. At all relevant times, Defendants established and maintained the LTIP and the Plan as employee pension benefit plans within the meaning of ERISA § 3(2)(A) and § 3(3), 29 U.S.C. § 1002(2)(A) and § 1002(3).

84. The LTIP was funded through deferred portions of eligible employees' earned wages, including Plaintiff's salary, and was maintained for the purpose of providing participants with deferred income and investment return to be paid at a date later than their earned work, meeting the statutory definition of an ERISA-covered plan.

85. Plaintiff was a participant in the LTIP and the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), having elected to defer approximately 50% of his salary, retroactive to August 1, 2024, into the Plan, in reliance on Defendants' representations that the funds would be invested prudently and returned in full with a guaranteed 50% gain by November 30, 2024, along with additional equity incentives.

86. Under the terms of the Plan as represented by Defendants, which promised a return of contributed salary plus a guaranteed 50% investment gain payable by November 30, 2024, in

addition to equity incentives, Plaintiff is entitled to the return of his withheld wages plus accrued investment earnings.

87. To date, Defendants have failed and refused to pay Plaintiff the benefits due to him under the Plan, including:

    a. The full amount of salary contributions Plaintiff made to the Plan,

    b. The guaranteed 50% return promised to Plan participants, and

    c. Associated equity incentives accrued under the Plan terms.

88. Plaintiff has made repeated demands for payment of his Plan benefits as required under 29 U.S.C. § 1132(a)(1)(B), but Defendants have wrongfully denied his claim and failed to produce any valid plan documents, explanation of benefits determination, or lawful basis for withholding payment.

89. Defendants' failure to pay benefits owed is actionable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which provides a cause of action for a participant to recover benefits due under the terms of an employee benefit plan, enforce rights under the plan, and clarify rights to future benefits.

90. As a direct and proximate result of Defendants' unlawful denial of benefits, Plaintiff has suffered financial losses equal to the unpaid return of his deferred wages contributed to the LTIP and the Plan, the unpaid plan benefits plus interest, loss of guaranteed investment return, loss of equity incentives, and related consequential damages.

## COUNT IV
## BREACH OF CONTRACT

91. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

92. On or about May 31, 2024, Plaintiff and Hamilton, in his capacity as CEO of Genius, executed the Employment Agreement to memorialize Plaintiff's role as CRO of Genius.

The Employment Agreement provided for Plaintiff's employment from June 3, 2024, to September 24, 2024, with an annual base compensation of $370,000, a 50% bonus of the base compensation, aggregating $555,000 annual OTP, and 400,000 shares, split adjusted, vested over three years under the LTIP.

93. Defendants breached the Employment Agreement by unlawfully terminating Plaintiff's employment without notice or consultation, and without authority in the case of Hamilton, less than 48 hours after the Board voted to remove Hamilton following Plaintiff's Whistleblower Report.

94. Defendants further materially breached the Employment Agreement by:

   a. Withholding approximately 50% of Plaintiff's earned salary beginning August 1, 2024, and failing to return those funds or pay the promised investment return;

   b. Failing to pay accrued salary through termination;

   c. Failing to deliver promised equity awards, especially by misappropriating Plaintiff's deferred salary through the purported Plan; and

   d. Failing to maintain agreed benefits through the LTIP and the Plan.

95. As a direct result of Defendants' breaches, Plaintiff suffered loss of wages, benefits, and equity compensation.

## VI. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court award:

96. **Reinstatement** or front pay in lieu thereof.

97. **Back pay and lost benefits** with interest.

98. **Compensatory damages** for emotional distress, reputational harm, and lost opportunities.

99. **Punitive damages** for Defendants willful, knowing, and/or wanton retaliatory action against Plaintiff.

100. **Statutory ERISA Relief** – repayment of misappropriated salary, equitable remedies, constructive trust, and attorneys' fees.

101. **Injunctive relief** – prevent further retaliation and interference with employment.

102. **Attorneys' fees and costs** – reasonable attorneys' fees, expert witness fees, and litigation costs.

103. **Any other relief** the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: October 22, 2025        **FOLEY & LARDNER LLP**

By: */s/ Robert A Scher*
    Robert A. Scher
    N.Y. Bar No. 2124790
    **FOLEY & LARDNER LLP**
    90 Park Avenue, 35th Floor
    New York, NY 10016
    Telephone: (212) 338-3405
    Facsimile: (212) 687-2329
    rscher@foley.com


R. Rene Carson
**THE LAW OFFICES OF
R RENE CARSON**
N.Y. Bar No. 2991826
459 Ave Sagrado Corazón
San Juan, Puerto Rico 00915
Telephone: (312) 286-8989
carsonrrene@gmail.com

**COUNSEL FOR PLAINTIFF**